IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff,

v.                                              CRIMINAL NO. 06-166 (CCC)

RALPH DAVILA-SANCHEZ,

Defendant.

## REPORT AND RECOMMENDATION

## INTRODUCTION

Defendant Ralph Dávila-Sánchez ("defendant Dávila-Sánchez") filed a Motion to Suppress, which was referred by the Court to the undersigned Magistrate Judge, claiming his post-arrest statements were involuntary, without a knowing and intelligent waiver of his constitutional rights.  Defendant submits the statements he made and the evidence seized, pursuant to the purported consent, must be suppressed because the consent was not voluntary. Defendant claims he was legally blind and could not read at the time he was asked to sign a Miranda Waiver form and a consent form to search his house.  Defendant also claims he suffered from dementia and was not in a position to knowingly waive his rights.[1]  (Docket No. 29).

---

[1] Defendant's assertion that he suffered from dementia was the object of a mental evaluation and report in this case (Docket No. 71) regarding defendant's competency to understand and participate in proceedings against him.. No objections being raised to the report, the Court recently concluded defendant Dávila-Sánchez "is not suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of proceedings against him or to assist properly in his defense." (Docket No. 72). The case was then referred back to the undersigned for the resetting of the suppression hearing which had been held in abeyance until the Court resolved the issue of defendant's mental competency.  (Docket Nos. 66 and 72).

United States of America v. Ralph Dávila-Sánchez
Criminal No. 06-166 (CCC)
Report and Recommendation
Page 2

The government filed its reply in opposition to the motion to suppress claiming the statements were voluntarily and freely made by defendant after being advised of his rights and waiving the same. The government also avers defendant voluntarily consented to the search of his house and, in fact, he even requested to be present during the search (Docket No. 57).

On October 11, 2007, an evidentiary hearing was held, wherein the testimonies of Special Agent Héctor Feliciano of Immigration and Customs Enforcement ("ICE"), for the government, and Dr. Osvaldo Carriles-García, for defendant, were presented.

## FACTUAL BACKGROUND

The government presented the testimony of SA Héctor Feliciano[2] which may be summarized as follows:

SA Feliciano works as a special agent with ICE and investigates cases of commercial fraud and child exploitation including production of child pornography.  On May 1, 2006, SA Feliciano was so employed and participated in the investigation of defendant Dávila-Sánchez. Defendant arrived at the Luis Muñoz Marín International Airport from the Dominican Republic on board a Caribbean Sun flight and was selected for secondary inspection by ICE.  The officers found nineteen (19) video cassettes, a 32 mm camera and a video camera in defendant's luggage.  The officers proceeded to check the videos and found what appeared to be child pornography in a couple of the videos.  Once the videos were found, SA Feliciano was contacted and he responded to the airport with Senior Special Agent Luis Ortiz.  Upon arrival

---

[2] In the absence of a warrant, the government carries the burden of proof.  United States v. Matlock, 415 U.S. 94 S.Ct. 988 (1974).

United States of America v. Ralph Dávila-Sánchez
Criminal No. 06-166 (CCC)
Report and Recommendation
Page 3

at the airport, the agents spoke with the officers at the airport who indicated they had the videos. SA Feliciano and Ortiz reviewed the videos and also witnessed what appeared to be videotaping of minors engaged in sexual conduct with defendant Dávila-Sánchez. Upon arrival at the airport, SA Feliciano was provided with the travel documents of defendant, including copies of his passport, plane ticket and Customs Declaration form.

Exhibit 1 is a photocopy of defendant's plane ticket which shows he arrived at the airport in San Juan on May 1, 2006 at 12:25 PM from Santiago, Dominican Republic.

Exhibit 2 is a photocopy of defendant's Customs Declaration form which has to be filled out upon entry to the United States. Defendant's form is completely filled out and signed at the bottom by defendant. The form shows defendant's address, date of birth and flight information. The form contains questions which require a response and which were indeed answered.

Exhibit 3 is a photocopy of defendant's passport which shows several stamps from the Dominican Republic other than the one for May 1, 2006.

SA Feliciano arrived at airport, reviewed the videos and read to defendant the Miranda warnings. Then, SA Feliciano and SA Ortiz conducted defendant's interview. SA Feliciano asked defendant whether he felt more comfortable speaking English or Spanish and defendant indicated English was fine. The Statement of Miranda Warnings and Waiver of Rights form in the English language was used and, as SA Feliciano read from the form to defendant, defendant was allowed to read along.

Exhibit 4 is a photocopy of the Statement of Miranda Warnings and Waiver of Rights form which was read to defendant and which bears SA Feliciano's signature as a witness at the bottom.  The document is the standard form used for investigation.  SA Feliciano read from the form line by line and allowed defendant to read along.  Then, SA Feliciano asked defendant whether he understood all his rights and, if he agreed, to initial each line which defendant did.  At the bottom of the form there is a Waiver that if defendant agrees to waive his rights and agrees to speak to the agents he signs the same.  After all the rights were read, defendant Dávila-Sánchez initialed each line with "R.D." in the presence of SA Feliciano.  As SA Feliciano was reading the form, defendant Dávila-Sánchez appeared to be understanding based on defendant's demeanor and within the agent's experience as a special agent in the field.  After the Statement of Rights was read, the Waiver of Rights was also read and defendant agreed to speak.  Then, defendant was requested to sign the Waiver of Rights prior to being interviewed.  The signature of defendant appears along with the signatures of SAs Feliciano and Ortiz in the Waiver of Rights.  Defendant signed the Waiver of Rights in the presence of both agents on May 1, 2006 at 15:43, that is 3:43 PM.

After defendant signed the Waiver of Rights, the agents proceeded with the interview in which defendant made some statements that may be summarized as follows: Defendant confirmed his biographical data, date of birth and indicated he resided in Juncos, Puerto Rico.  Defendant stated he was arriving from the Dominican Republic to where he traveled two (2) or three (3) times a year for about two (2) or three (3) weeks at a time.  Defendant stated he

United States of America v. Ralph Dávila-Sánchez
Criminal No. 06-166 (CCC)
Report and Recommendation
Page 5

had been traveling to the Dominican Republic every year since 1983.  When defendant was asked why he went so often, he stated  to "mess around."  Defendant indicated he bought a video camera in 2000 which he used during his vacations to record different scenes including sexual acts he committed at the Dominican Republic.  Defendant stated he would stay at his sister in law's mother house while at the Dominican Republic and usually when he was there, no one else was present.  Defendant informed his sister in law's cousin would introduce him to girls in the area and he would give them money or gifts in exchange for them to pose or engage in sexual relations with defendant Dávila-Sánchez.  Defendant stated he was traveling alone the date of his arrest and the travel documents so show.  The travel documents show defendant departed San Juan April 7, 2006 and returned on May 1, 2006.

SA Feliciano took defendant to the area where the videos were reviewed and showed him some of the scenes from one of the videos and asked him about some of the adult females which appeared in the videos, and he answered.  Then, a scene was shown to defendant of what appeared to be a ten (10) years old female minor and defendant told the agents the name and the area where she lived and that she was nineteen (19) years old and was suffering from malnutrition.  After that, the agents asked defendant whether he had more videos a this residence or a computer and defendant said he had more videos at his residence.  Thus, the agents secured defendant's consent to search his residence.  The interview lasted about forty five (45) minutes to one (1) hour.  During this time, defendant requested on several occasions to use the bathroom and he was allowed to do so.  At all times during defendant's interview,

he was answering the questions posed in a coherent manner and he appeared alert and understanding the questions. During the interview, defendant never indicated he could not see. In fact, defendant read the Statement of Miranda Rights along with SA Feliciano. At no time during the interview did SA Feliciano display his firearm, did not harass defendant, did not coerce defendant and did not intimidate defendant.

After SA Feliciano obtained information defendant had other videos at his residence, SA Feliciano sought consent to search his residence. Defendant indicated his brother had the keys to his residence and SA Feliciano asked from defendant whether he could contact his brother to open the residence so it could be searched. Defendant stated he would consent to the search of his house if he was allowed to be present during the search of his residence. When defendant was asked to consent, he was provided with a written document.

Exhibit 5 is a photocopy of defendant's Consent to Search Form. The form stated that defendant Dávila-Sánchez voluntarily and without coercion consented to a search of his house by SA Feliciano and SA Ortiz. Defendant provided the address of his residence. Defendant signed this form in the presence of SA Feliciano on May 1, 2006 at 18:35, that is, 6:35 PM. SA Feliciano signed the form on the first line and SA Ortiz signed on the second line. Once the consent was obtained, the agents complied with defendant's request that he be present during the search. The agents took the defendant and, since they did not know the area, defendant directed them to a rural area in Barrio Valenciano in Juncos, Puerto Rico. It was difficult to arrive to the area and the agents were able to get there with the directions provided by

defendant who guided the agents to the area.  Once they arrived at defendant's residence, the agents contacted defendant's brother who resided across the street from defendant's house. Defendant's brother brought the key to open defendant's residence and the agents began searching.  Defendant lived by himself.  The agents found fifty four (54) video cassettes, most in defendant's bedroom.  Defendant was present during the search of the house.  Once the videos were found, the agents put them in evidence bags and left the residence.  Defendant Dávila-Sánchez was taken to MDC Guaynabo.

On cross examination, SA Feliciano stated the scheduled time of arrival of defendant on May 1, 2006 was 12:25 PM and he had no reason to believe the flight did not arrive on time. Defendant was picked up for pre-selection based on information on record related to a previous flight many years ago in which defendant was found in possession of child pornography.  SA Feliciano has been trained on interrogation techniques.   During the course of interview, defendant stated he was taking medications.  SA Feliciano did not recall whether defendant had his medications at the airport but he recalled defendant asked to take his medications at his residence. SA Feliciano admitted that when one looks at defendant's face you notice something strange with his eyes.  Defendant is crossed-eyed and his eyes move back and forth.  Defendant did not contact any family member during the interview.  SA Feliciano stated it is not illegal to transport videos. SA Feliciano indicted that at some point a doctor must examine the videos to determine whether a crime was committed.  The doctor examined the videos in this case the day after the arrest.  SA Feliciano testified no medical professional looked at the videos to

United States of America v. Ralph Dávila-Sánchez
Criminal No. 06-166 (CCC)
Report and Recommendation
Page 8

determine the age of the minors until the following day.  SA Feliciano admitted he is not an expert to determine the age of the girls on the videos.  Defendant was not free to go during his interview at the airport when the agents started talking to him.  Only SA Ortiz and SA Feliciano were present during defendant's interview.  Defendant was interviewed in a separate room away from the videos.  Defendant's interview was not video taped nor audio recorded. Defendant did not provide any written statement. Defendant was not provided with pen and paper to provide a written statement. It is not standard procedure to video tape and audio record an interview of a suspect.

SA Feliciano indicated he was not present when Exhibit 2 (Customs Form) was filled out. No writing analysis was done of the form to determine whose hand writing it was.  Thus, if someone else on the plane filled out the form for defendant, SA Feliciano would not know. The videos were shown to defendant after the interview had started.

Exhibit 4 (Miranda Warning Statement) was executed and signed at 15:43, that is, at 3:43 PM. Thus, defendant signed the form more than three (3) hours after he had departed plane, assuming the plane arrived on time.  SA Feliciano is not aware of whether there was a delay or not in the arrival of defendant's plane.  SA Feliciano prepared a report in this case. The report does not provide any detail as to SA Feliciano reading line by line to defendant the waiver.  SA Feliciano does not recall for certain whether defendant was wearing his glasses when reading the form along with him.

United States of America v. Ralph Dávila-Sánchez
Criminal No. 06-166 (CCC)
Report and Recommendation
Page 9

SA Feliciano stated all information contained in Exhibit 5, except defendant's printed name and signature, was filled out by SA Feliciano.   Exhibit 5 was executed at 6:35 PM, thus, defendant had been in custody for over six (6) hours.  During this period of time defendant did not eat anything.  SA Feliciano does not recall whether he inquired upon defendant whether he had diabetes or any other element which required him to eat frequently.  SA Feliciano's report does not show usage of the restroom.  Defendant was cooperative and answered the questions.  Defendant did not refuse to answer questions.  Defendant did not say he engaged in sexual acts with minors.  Defendant stated it was his belief the persons involved were over eighteen (18) years.

In re-direct examination, SA Feliciano testified he was not at the airport when defendant arrived.  SA Feliciano arrived at the airport around 3:15 PM after receiving a duty call from the child pornography general investigations group. SA Feliciano has been in this specific squad for about five (5) years in which he has participated in about 40 to 50 investigations involved with the production, possession and distribution of child pornography.   As part of these investigations, SA Feliciano reviews images of child pornography.  He has reviewed thousands of these images.  Upon looking at the images of child pornography, SA Feliciano is able to determine whether a female is less than eighteen (18) years old.  Once SA Feliciano arrived at the airport, he reviewed the videos seized from defendant's luggage and was able to pick out minors who, in his experience were less than eighteen (18) years, including a ten (10) years old minor female.

Defendant did not request any medication during his interview nor did he ask for glasses. When SA Feliciano was reading the Miranda Warning, he read it in verbal form and showed defendant the form.  Defendant did not indicate he needed glasses and signed each line. Defendant did not indicate he had diabetes or any physical impediment.  Defendant answered the questions in a coherent manner.

The defense presented the testimony of Dr. Osvaldo Carriles-García which may be summarized as follows:

Dr. Carriles is an optometrist who graduated from the Interamerican University School of Optometry in 1986.  Dr. Carriles knows defendant because he examined him on September 13, 2005.  Dr. Carriles stated defendant visited him because his glasses were broken and he needed new glasses.  Dr. Carriles examined defendant's eyes and found problems with defendant's vision.  Defendant could not see well from a distance nor from up close.  Dr. Carriles found defendant had myopia (patient cannot see well from a distance) and presbyopia (patient cannot see well from up close).   Defendant had high degree of difficulty in seeing things up close and afar.

Exhibit A is a photocopy of the one page report of the examination performed on September 13, 2005 by Dr. Carriles to defendant which includes data on the record.

On cross-examination, Dr. Carriles indicated Exhibit A is the result of the examination performed on defendant on September 13, 2005.  This is the last examination performed.  As part of Exhibit A, there is a diagnosis which indicates that spectacle was prescribed to improve

distance vision a little bit.  It also indicates prescription lenses were also prescribed but patient reports he never reads and does not want bifocal lenses.

Upon questions of the undersigned, Dr. Carriles indicated he did not examine defendant on May 1, 2006 or anytime thereafter.  Dr. Carriles does not know the condition of defendant's eyesight on May 1, 2006.

Upon defendant counsel's questions, Dr. Carriles stated he has not examined a blind person.  From September 2005, no information has been received by Dr. Carriles to suggest defendant's vision improved after his examination.

Upon government's counsel questions, Dr. Carriles testified that in his report it is not indicated that defendant is blind.  Defendant is not blind according to Dr. Carriles' report.

## LEGAL BACKGROUND

**A.   Miranda Warnings in General.**

The provision of warnings under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966), although not totally dispositive, is an "important factor," as are "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances ... and, particularly, the purpose and flagrancy of the official misconduct." Brown v. Illinois, 422 U.S. 590, 603-04, 95 S.Ct. 2254, 2261-62 (1975).  As such, circumstances attending to statements provided by a defendant while holding a rifle over him while he was still handcuffed, were considered to be one at the breach way and led the trial court to suppress the statements as involuntary.  Still, the court also ruled that law enforcement actions of removing him to the station, rereading him his

Miranda rights, and then questioning him later that same evening in an atmosphere when he appeared to be relaxed, fully composed, and in an open cell, would not render the statements coercive or otherwise inadmissible. United States v. Ayres, 725 F.2d 806, 810 (1st Cir. 1984).

In Miranda, the Supreme Court stated that 'prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Miranda, 384 U.S. at 444.

In Miranda, the Supreme Court further held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Unless the government shows that the proper warnings and waiver were given, any statements made by the accused are inadmissible in evidence, unless a defendant is shown to have waived his rights under Miranda which "is made voluntarily, knowingly and intelligently." Miranda, 384 US at 444. Consequently, a statement obtained by government agents as a result of custodial interrogation must be suppressed unless the government can demonstrate that the defendant was properly advised of his rights and that he voluntarily, knowingly and intelligently waived those rights. United States v. Palmer, 203 F.3d 55, 60  (1st Cir. 2000).

Miranda warnings need not follow any particular format, so as to avoid a ritualistic formalism requirement, as long as the substance of the rights involved is adequately conveyed.

California v. Prysock, 451 U.S. 1301, 101 S.Ct. 1773 (1981).  Even an unsigned statement goes to its weight and credibility not to its admissibility when it is proven that the defendant understood and adopted the substance of such statement.  Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407 (1963).

For a Miranda waiver to be knowing and intelligent, it must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135 (1986). However, the suspect need not "know and understand every possible consequence of a waiver of the 5th Amendment privilege." Colorado v. Spring, 479 U.S. 564, 574 (1987). Rather, he need only be aware that "he may choose not to talk to law enforcement officers, and to talk only with counsel present, or to discontinue talking at any time." *Id.* In adhering to said legal principles, a statement is not considered involuntary unless it is procured by police coercion or trickery.  Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, (1986), *accord*, United States v. Byram, 145 F.3d 405, 407 (1st Cir. 1998); United States v. Santos, 131 F.3d 16, 19 (1st Cir. 1997).

Whether defendant has validly waived his rights is a question to be determined by examining the totality of the circumstances in which said statement was procured and given. Failure to warn a defendant of his rights is, when combined with police coercion, is deemed significant to a finding of involuntariness.  Procunier v. Atchley, 400 U.S. 446, 91 S.Ct. 485 (1971).

When challenged statements are made by a defendant after arrest, "the degree of free will exercised by the defendant is not irrelevant in determining the extent to which the basic purpose of the exclusionary rule will be advanced by its application." United States v. Ceccolini, 435 U.S. 268,  276, 98 S.Ct. 1054 (1978) (citing Wong Sun, 371 U.S. at 491). After receipt of the Miranda warnings, a defendant's "choice whether to exercise his privilege to remain silent should ordinarily be viewed as an act of free will." United States v. Esquilín, 208 F.3d 315, 319 (1st Cir.2000) (quoting Oregon v. Elstad, 470 U.S. 298, 310-11, 105 S.Ct. 1285 (1985)); United States v. Paradis, 351 F.3d 21, 34 (1st Cir. 2003).  "The Supreme Court has confined the voluntariness concept by holding that only [statements] procured by coercive official tactics should be excluded as involuntary." Byram, 145 F.3d at 407 (citing Connelly, 479 U.S. at 167).

In recent years, the Supreme Court has confined the voluntariness concept by holding that only confessions procured by coercive official tactics should be excluded as involuntary. Connelly, 479 U.S. at 167. See United States v. Santos, 131 F.3d 16, 19 (1st Cir. 1997). "Free choice" is no longer a touchstone and the Supreme Court  ruled in Connelly that a volunteered confession was admissible even if the product of a psychosis that undermined the suspect's ability to make a free and rational choice. See Byram, 145 F.3d at 407-408.

As such, the voluntariness of a statement would depend on whether the will of the defendant was overborne to consider that the statement was not his free and voluntary act.  This

is to be resolved in light of the totality of the circumstances.  United States v. Jackson, 918 F.2d

236, 241 (1st Cir.1990).  *See* United States v. Marenghi, 109 F.3d 28, 33 (1st Cir. 1997).[3]

## B.  **Miranda Warnings in Border Search.**

The warning requirement in Miranda need not be given to one who is entering the

United States unless and until the questioning agents have probable cause to believe that the

person questioned has committed an offense, or the person questioned has been arrested,

whether with or without probable cause. It is at this point, in border cases, that the investigation

has 'focused' in the Miranda sense." Chávez-Martínez v. United States, 407 F.2d 535, 539 (9th

Cir. 1969); s*ee also* United States v. Sosa, 469 F.2d 271 (9th Cir. 1972).

A law enforcement officer's subjective and undisclosed view concerning whether a

person being interrogated by law enforcement officers is a criminal suspect is irrelevant to the

assessment whether the interrogatee is in custody and, thus, entitled to Miranda warnings as to

the right to counsel and as to the privilege against self-incrimination.  The initial determination

as to the custody issue depends on the objective circumstances of the interrogation, not on the

views harbored by either the interrogating officers or the interrogatee.  Under Miranda (1) a

police officer's unarticulated plan has no bearing on the question whether a suspect was in

custody at a particular time, (2) the only relevant inquiry is how a reasonable person in the

suspect's shoes would have understood the situation, and (3) save as they are communicated

or otherwise manifested to the interrogatee, an officer's evolving but unarticulated suspicions

---

[3]  Jury may still assess relevant evidence on the issue of voluntariness under the circumstances.  *See* United States v. Fera, 616 F.2d 590, 594 (1st Cir. 1980); United States v. Cowden, 545 F.2d 257 (1st Cir. 1976).

do not affect the objective circumstances of an interrogation or interview, as one cannot expect the interrogatee to probe the officer's innermost thoughts. Stansbury v California, 511 US 318, 114 S Ct 1526 (1994).

## ANALYSIS

**I.     Probable Cause for Defendant's Detention.**

Defense counsel orally argued for the first time at the suppression hearing that there was no probable cause for defendant's detention until the day after the arrest when the videos found in defendant's luggage were viewed by a doctor.   The government in turn argued that defendant's detention was a border search and probable cause was established after the video, containing images of what appeared to be in SA Feliciano's experience a ten (10) years old female minor engaged in sexual conduct, was found.

Based on the evidence presented at the suppression hearing, we conclude SA Feliciano acquired probable cause to believe that defendant had committed an offense when he viewed the videos found in defendant's luggage and found some images of a minor, who in his experience was around ten (10) years old, engaged in sexual conduct.   It is uncontested SA Feliciano has been working with an ICE squad specialized in investigating child pornography cases for five (5) years.   SA Feliciano has participated in 40 to 50 investigations of child pornography in which he has viewed thousands of images.   Based in this experience, SA Feliciano is qualified to make a determination of whether a female is in fact a minor.   As such, there was no need in this case for a physician to review the videos, to determine whether the

United States of America v. Ralph Dávila-Sánchez
Criminal No. 06-166 (CCC)
Report and Recommendation
Page 17

female involved was a minor, to establish probable cause for defendant's arrest.  Taking SA

Feliciano's experience with child pornography cases was enough, under the totality of the

circumstances, to establish probable cause for defendant's detention and custodial interrogation

at the time.  It is at this juncture, after reviewing the videos and determining that a minor was

involved, that SA Feliciano gave defendant his Miranda Warning first and then conducted the

interview.

Moreover, based on the jurisprudence above cited, the primary issue in this kind of

situations is custody and the custodial interrogation and not probable cause of the agent as

argued by defense counsel.   The probable cause issue is secondary in relation to the

voluntariness under the totality of the circumstances.   In fact, as stated above, a law

enforcement officer's subjective and undisclosed view concerning whether a person being

interrogated by law enforcement officers is a criminal suspect is irrelevant to the assessment

whether the interrogatee is in custody and, thus, entitled to Miranda warnings as to the right to

counsel and as to the privilege against self-incrimination, because the initial determination as

to the custody issue depends on the objective circumstances of the interrogation, not on the

views harbored by either the interrogating officers or the interrogatee.  Stansbury v California,

511 US 318, 114 S Ct 1526.

Thus, based on the above, we conclude SA Feliciano had probable cause to detain

defendant after reviewing the videos and determining a minor female was engaged in sexual

conduct and properly provided to defendant the Miranda Warnings, as explained herein below in detail.

## II.    Defendant's  Statements to SA Feliciano and SA Ortiz and his Consent to Search his Residence were Knowing and Voluntary.

The unchallenged testimony of SA Feliciano and the documentary evidence presented at the suppression hearing clearly demonstrate defendant Dávila-Sánchez gave the challenged statements to SA Feliciano and SA Ortiz voluntarily **after** having been read the Miranda warnings and having knowingly signed the proper waiver (Exhibit 4).  No evidence was presented by defendant on this issue except the testimony of Dr. Carriles as to defendant's vision problems.  Defendant did not take the stand.

This Magistrate Judge finds defendant Dávila-Sánchez was advised of his constitutional rights in accordance with Miranda, 384 U.S. 436, while under the custody of the federal agents and any post-arrest statements were voluntarily produced after having knowledge and understanding of his rights, as testified by SA Feliciano, whose testimony is uncontested. Moreover, defendant voluntarily signed the consent to search his house (Exhibit 5) and understood the consequences of signing the same.

SA Feliciano testified defendant was verbally advised of his rights in English because defendant stated he felt comfortable with the English language.  As SA Feliciano was reading the advise of rights he allowed defendant to read the form along with him.

It is uncontested that Exhibit 4 is a photocopy of the Statement of Miranda Warnings and Waiver of Rights form which was read to defendant and which bears SA Feliciano's

signature as a witness at the bottom.  The document is the standard form used for investigation.

SA Feliciano read from the form line by line and allowed defendant to read along.  Then, SA

Feliciano asked defendant whether he understood all his rights and if he agreed, defendant was

to initial each line.  At the bottom of the form there is a Waiver that if defendant agrees to waive

his rights and agrees to speak to the agents he signs the same.  After all the rights were read,

defendant Dávila-Sánchez initialed each line with "R.D." in the presence of SA Feliciano.  As

SA Feliciano was reading the form, defendant Dávila-Sánchez appeared to be understanding

based on defendant's demeanor and within the agent's experience as a special agent in the

field.  After the Statement of Rights was read, the Waiver of Rights was read and defendant

agreed to speak.  Then, defendant was requested to sign the Waiver of Rights prior to being

interviewed.   The signature of defendant appears along with the signatures of SAs Feliciano

and Ortiz in the Waiver of Rights.  Defendant signed the Waiver of Rights in the presence of

both agents on May 1, 2006 at 15:43, that is 3:43 PM.

 After defendant signed the Waiver of Rights, the agents proceeded with the interview

in which defendant made some statements which are summarized above.

 After SA Feliciano obtained information defendant had other videos at his residence,

SA Feliciano sought to obtain consent to search his residence.  Defendant indicated his brother

had the keys to his residence and SA Feliciano asked from defendant whether he could contact

his brother to open the residence so it could be searched.  Defendant stated he would consent

if he was allowed to be present during the search of his residence.  When defendant was asked

to consent, he was provided with a written document.  Exhibit 5 is a photocopy of defendant's

Consent to Search Form.  The form stated that defendant Dávila-Sánchez voluntarily and without coercion consents to a search of his house by SA Feliciano and Ortiz.  Defendant provided the address of his residence.  Defendant signed this form in the presence of SA Feliciano on May 1, 2006 at 18:35, that is, 6:35 PM.  SA Feliciano signed the form on the first line and SA Ortiz signed on the second line.  Once the consent was obtained, the agents complied with defendant's request that he be present during the search.  The agents took the defendant and, since they did not know the area, defendant directed them to a rural area in Barrio Valenciano in Juncos, Puerto Rico.  It was difficult to arrive to the area and the agents were able to get there with the directions provided by defendant who guided the agents to the area.  Once they arrived at defendant's residence, the agent contacted defendant's brother who resided across the street from defendant's house.  Defendant's brother brought the key to open defendant's residence and began searching.

SA Feliciano also stated that defendant was not coerced or threatened during the interview.

Accordingly, and pursuant to the uncontested testimony, the statements provided by defendant verbally were voluntary and without coercion, after being informed of his Miranda warnings and a valid waiver of same.  Moreover, the uncontested evidence shows defendant voluntarily signed the consent to search his house and understood the same.

The only attempt of the defense in trying to show the statements provided by defendant were not voluntary and were coerced is defense counsel's argument that defendant was legally blind at the time.  Defendant presented the testimony of Dr. Carriles in an attempt to establish

defendant's problems with his vision.  Dr. Carriles examined defendant nine (9) months prior to his arrest because his glasses were broken and he needed new ones.  Dr. Carriles found defendant did not see well from close and afar.  Nonetheless, Dr. Carriles was asked whether defendant was blind and he answered in the negative.  Moreover, Dr. Carriles could not attest to defendant's eyesight at the time of his arrest because his examination of defendant was conducted nine (9) moths prior to the arrest.  Thus, even if we take Dr. Carriles' testimony as true, there is no credible evidence to support defendant's contention that he was legally blind at the time of his arrest and could not see and read the waiver of rights and the consent to search his residence before he signed the same.  On the contrary, the uncontested evidence shows defendant read along the waiver of rights (Exhibit 4) with SA Feliciano and understood the same.  Moreover, it is also uncontested that defendant accompanied the agents to his house and showed them how to get to his residence which was located in a rural area in Barrio Valenciano in Juncos, Puerto Rico.  It is uncontested that, after having obtained the consent to search the house, defendant went along with the agents, who were not familiar with the area, and showed them how to get to his house.

Defendant Dávila-Sánchez had the opportunity to impeach SA Feliciano, present other evidence on his behalf, challenge the government's evidence and he failed to do so.  No evidence of coercion whatsoever has been introduced in this case.  In addition, the evidence presented establishes that at no time did defendant ask to be assisted by counsel nor indicated having doubts concerning his constitutional rights.  As such, except for arguments by counsel as to defendant being "legally blind", defendant has not rebutted the evidence presented by the

United States of America v. Ralph Dávila-Sánchez
Criminal No. 06-166 (CCC)
Report and Recommendation
Page 22

government at the suppression hearing before this Magistrate Judge which shows defendant's

interview was conducted after defendant voluntarily waived his Miranda rights, and thus, his

post-arrest statements were voluntary and not in violation of his  Fifth Amendment rights.  No

credible evidence has been presented either to rebut the government's evidence that defendant

knowingly and voluntarily signed the consent to search his house.

Based on the witnesses' testimony at the evidentiary hearing and having assessed their

credibility, it is determined that, pursuant to the preponderance of the evidence and considering

the totality of the circumstances, defendant's statements and the consent to search his residence

were knowing and voluntary, and thus consonant with their admissibility under the above

findings and applicable law.

## CONCLUSION

In view of the foregoing, it is recommended that defendant Dávila-Sánchez' Motion to

Suppress (Docket No. 29) BE DENIED.

IT IS SO RECOMMENDED.

The parties have ten (10) days to file any objections to this report and recommendation.

Failure to file same within the specified time waives the right to appeal this order.  Henley

Drilling Co. v. McGee, 36 F.3d 143, 150-151 (1st Cir. 1994); United States v. Valencia, 792

F.2d 4 (1st Cir. 1986).  See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d

United States of America v. Ralph Dávila-Sánchez
Criminal No. 06-166 (CCC)
Report and Recommendation
Page 23

985, 991 (1st Cir. 1988) ("Systemic efficiencies would be frustrated and the magistrate's role

reduced to that a mere dress rehearser if a party were allowed to feint and weave at the initial

hearing, and save its knockout punch for the second round").

In San Juan, Puerto Rico, this 22nd day of October of 2007.


                                   s/CAMILLE L. VELEZ-RIVE
                                   CAMILLE L. VELEZ-RIVE
                                   UNITED STATES MAGISTRATE JUDGE